**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

DANIELLE BUNEL, individually and on behalf of all others similarly situated,

Plaintiff,

v.

E3 CONSULTANTS GROUP, LLC; E3 TAX, LLC d/b/a E3 FAMILY OFFICE; and E3 WEALTH, LLC,

Defendants.

Case No.: ____________________

**CLASS ACTION**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff, DANIELLE BUNEL ("Plaintiff" or "Ms. Bunel"), individually and on behalf of all others similarly situated, brings this action against Defendants E3 CONSULTANTS GROUP, LLC ("E3 Consultants"), E3 TAX, LLC d/b/a E3 FAMILY OFFICE ("E3 Tax"), and E3 WEALTH, LLC ("E3 Wealth") (collectively, "E3" or "Defendants").

## NATURE OF THE ACTION

1. This class action arises from E3's sale, to its own tax-planning clients, of purported "Native American Tribe Trust Fund Federal Income Tax Credits" issued by White River Energy Corp. ("White River") (collectively, the tax credits are referred to as the "White River Tax Credits").

2. The White River Tax Credits do not exist. No provision of the Internal Revenue Code creates them, and no statute permits a private company to buy, hold or resell a "tribal" credit

against a third party's federal income tax. The IRS has publicly warned that these federal tax credits do not exist and its Internal Revenue Manual lists "Tribal Tax Credit," "Native American Tax Credit" and "Sovereign Tribal Tax Credit" among non-valid credits that "cannot be allowed, regardless of documentation provided." The Cherokee Nation, which E3 told its clients was the source of the credits, has also stated that it did not authorize and is not associated with these tax credits.

3. E3 was not a bystander. E3 held itself out as a family office, providing "comprehensive wealth and tax strategies." E3's owners, John Moriarty and Joe Quartucci, were Financial Industry Regulatory Authority ("FINRA") registered Financial Advisors, who also accessed their brokerage firm clients and solicited them to purchase the White River Tax Credits. It charged clients flat annual fees of up to $30,000 for "Advance Due Diligence Resources," "Income Tax Mitigation" and "due diligence on proprietary wealth & tax strategies." It prepared clients' federal income tax returns. E3 then used that position of trust to sell its clients the White River Tax Credits, instructed them how to claim the credits on their Form 1040 and claimed the credits on returns E3 itself prepared.

4. The gravamen of this action is that E3 rendered tax advice no reasonably competent tax professional would render and charged for a due-diligence review it did not adequately perform. A reasonably careful tax professional would have recognized that: (a) federal income tax credits exist only by act of Congress, and no Code section authorized the White River Tax Credits; (b) the purported issuer of the White River Tax Credits was a Texas limited liability company, not a tribe; (c) the purported "Treasury procurement number" was a pending submission in a federal vendor portal, not an IRS-issued credit; (d) no tax opinion, private letter ruling or other authority supported the White River Tax Credits when E3 sold them; and (e) White River's touted

"indemnity" arose only after a final Tax Court judgment and was capped at $25 million across all buyers. Among other things, E3 failed to identify, investigate or disclose any of these red flags.

5. E3's judgment was compromised by its own financial interest. Under a non-disclosure and marketing agreement with White River, E3 Tax served as White River's paid distribution partner. White River's form purchase agreement priced the credits at $50,000 per $100,000 unit; E3 sold the same units to its clients for $60,000, retaining a $10,000 per-unit spread. E3 charged separate "due diligence" fees on top of the spread and on top of its annual engagement fees. White River's general counsel has stated in writing that E3 "collected commissions and a tax planning fee" from purchasers "that amount to between $5,000,000 and $10,000,000.

6. The result was predictable. The IRS has disallowed the credits, reversed the payments claimed and assessed the resulting tax, penalties and interest. Class members have lost the entire purchase price, the fees paid to E3, and the penalties, interest and professional costs that followed. Ms. Bunel is one of those clients. She paid E3 $30,000 for an engagement that promised "Advance Due Diligence Resources" and "Income Tax Mitigation." On E3's recommendation she paid $150,000 for White River Tax Credits and paid E3 an additional $10,000 "due diligence" fee. Her investment is a total loss.

7. Plaintiff asserts claims for professional negligence, negligence and breach of contract on behalf of herself and all others similarly situated who purchased White River Tax Credits through, or on the recommendation of, E3. Plaintiff seeks compensatory damages, including the return of all fees and compensation E3 received in connection with the credits, the principal investment made by each investor in the White River Tax Credits, penalties and interest charged to each investor by the IRS, together with interest and costs.

## THE PARTIES

8. Plaintiff Danielle Bunel is a natural person over the age of eighteen and a citizen of the State of Georgia, residing in Grayson, Georgia. At all relevant times she was a client of E3 and purchased White River Tax Credits through E3.

9. Defendant E3 Consultants Group, LLC is a Missouri limited liability company with its principal place of business at 906 S. Kirkwood Road, St. Louis, Missouri 63122. It does business as "e3 ConsultantsGROUP" and is a named contracting party in E3's standard-form "Wealth & Tax Professional Services" engagement letters.

10. Defendant E3 Tax, LLC is a Missouri limited liability company with its principal place of business at 906 S. Kirkwood Road, St. Louis, Missouri 63122. It does business as "e3 Family Office." E3 Tax prepares individual and corporate income tax returns, collects E3's engagement fees, served as White River's "distribution partner" for the White River Tax Credits, and is the counterparty to the E3 "Addendum" each purchaser signed.

11. Defendant E3 Wealth, LLC is a Missouri limited liability company with its principal place of business at 906 S. Kirkwood Road, St. Louis, Missouri 63122. E3 Wealth is the wealth-management arm of E3's "family office model." Under E3's engagement letters, clients met with "team members of e3 Tax and e3 Wealth" for "[e]ducation on potential strategies or investments that could enhance your financial situation."

12. John E. Moriarty, CPWA, ChFC, is the Founder and President of E3. He executes E3's engagement letters on behalf of "e3 ConsultantsGROUP" and "e3 Tax, LLC dba e3 Family Office." At all relevant times Mr. Moriarty and the other E3 personnel referenced herein acted within the course and scope of their agency and employment with Defendants.

13. Defendants operate as a single, integrated enterprise. They share ownership, management, offices, personnel, letterhead, branding and a website (www.e3familyoffice.com),

and they market themselves jointly as "e3" and "e3 Family Office." Each Defendant acted as the agent of the others in marketing, recommending and selling the White River Tax Credits, and each is liable for the acts and omissions alleged herein.

## JURISDICTION AND VENUE

14. This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The proposed class has more than 100 members; the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and at least one class member, including Plaintiff, is a citizen of a State different from at least one Defendant.

15. For purposes of 28 U.S.C. § 1332(d)(10), each Defendant is a citizen of Missouri, the State under whose laws it is organized and in which it has its principal place of business. Plaintiff is a citizen of Georgia.

16. Upon information and belief, fewer than two-thirds of the members of the proposed class are citizens of Missouri. E3 marketed the White River Tax Credits to clients and "distribution partners" across the United States, and the exceptions in 28 U.S.C. § 1332(d)(3) and (d)(4) do not apply.

17. This Court has personal jurisdiction over each Defendant because each is organized under Missouri law, maintains its principal place of business in Missouri, and directed the conduct alleged herein from Missouri. In addition, E3's engagement letters provide that clients and E3 "submit to the jurisdiction of the State of Missouri."

18. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because each Defendant resides in this District and a substantial part of the events and omissions giving rise to the claims occurred here. E3's engagement letters designate St. Louis County, Missouri,

which lies within this District and Division, as the venue for actions arising out of E3's services, and select Missouri law as the governing law.

## FACTUAL ALLEGATIONS

### A. E3's "Family Office" Business and Its Undertakings to Clients

19. E3 markets itself as a family office that provides "comprehensive wealth and tax strategies." Its model combines, under one brand, tax return preparation, tax mitigation planning, investment education, and access to tax-driven products, delivered through E3 Consultants, E3 Tax, E3 Wealth and an affiliated registered investment adviser, Transce3nd, LLC.

20. E3 contracts with clients through a standard-form "Engagement Letter with e3 ConsultantsGROUP for Wealth & Tax Professional Services (WTPS)" (the "Engagement Agreement"). (*See* Cover Email with Template Engagement Letter Sent to Danielle Bunel, attached as **Exhibit A**). Mr. Moriarty executes the Engagement Agreement as "Founder & President, e3 ConsultantsGROUP, e3 Tax, LLC dba e3 Family Office," and clients authorize E3 Tax to charge the fee. (*See* **Ex. A**). The Engagement Agreement was electronically signed by Daniel Bunel on January 16, 2024. (*See* Executed Danielle Bunel Engagement Agreement, attached as **Exhibit B**).

21. In the Engagement Agreement, E3 undertook, among other things, to:

(a) provide "Income Tax Preparation" to "ensure compliance with the IRS tax code ... through accurate and complete tax filing";

(b) provide "Income Tax Mitigation," including strategies involving "tax credits";

(c) "advise you on the tax implications of an investment in light of today's tax laws";

(d) "assess the deductions you are currently claiming and make recommendations," with the stated "goal" being "to reduce the chance of an IRS audit and increase the chance of a successful outcome if you do get audited";

(e) "use our professional judgment in evaluating and advising you of the individual and corporate federal and state income tax ramifications related to your ... investments"; and

(f) "use our best efforts for you at all times."

22. The "WTPS.12" service tier, which carried a $30,000 flat annual fee, expressly covered "Advance Due Diligence Resources," "Income Tax Mitigation," "Tax Return Completion," "tax research" and "due diligence on proprietary wealth & tax strategies offered by the e3 network." It promised WTPS.12 clients "'priority access' to certain income tax mitigation strategies and alternative investment/financial vehicles."

23. The Engagement Agreement also identifies "Mick Law" as "a legal firm that provides comprehensive due diligence reports on private investments" with which E3 "may partner."

24. The Engagement Agreement states that E3 "can only advise you on the tax implications of an investment in light of today's tax laws." E3 thus defined its role as that of a tax professional whose advice concerned the tax consequences of the strategies it presented. The Engagement Agreement further provides: "If the entire adverse judgment is a result of our negligence, we will pay the penalty.

25. The Engagement Agreement is governed by Missouri law. Upon information and belief, every Class member who was an E3 engagement client signed an Engagement Agreement in the same or a substantially similar form.

**B. Ms. Bunel's Relationship with E3**

26. Ms. Bunel grew up in New Orleans and attended Louisiana State University briefly but did not earn a degree. She worked as a gymnastics instructor and, in 2006, founded Nexsentio, a commercial janitorial company that has grown to approximately 500 employees in five states.

29. Despite her success in business, Ms. Bunel has little investment experience and no training in tax law. Before engaging E3, she had never worked with a financial advisor.

30. In or about 2020, Ms. Bunel was introduced to E3 to provide tax preparation services for her growing business. E3 promoted itself as a one-stop shop for tax and investment advice whose differentiating feature was that the tax strategies it recommended had passed an extensive due diligence process.

31. In or about January 2024, at or near the time the White River Tax Credits were sold to Ms. Bunel, E3 transmitted to Ms. Bunel and her business partner, Rene Velazquez, an Engagement Agreement at the WTPS.12 tier covering "completion of your 2023 federal/state income tax files and 2024 wealth and tax strategies," for a fee of $30,000. Ms. Bunel accepted the engagement and paid the fee. (*See* **Ex. B**).

32. Ms. Bunel relied on E3 to prepare her tax returns, to plan her tax strategy and to vet the strategies E3 brought to her. She reposed trust and confidence in E3's expertise, and E3 accepted that trust.

**C. The White River Tax Credits**

33. White River is a Nevada corporation headquartered in Fayetteville, Arkansas, whose common stock traded over the counter under the symbol "WTRV." It held itself out as an oil and gas exploration and production company.

34. On November 22, 2023, White River signed a "Joint Venture Letter Agreement" with an unnamed counterparty described as the "proxy" and "tribal nominee" of a "confidential Native American tribe." In a Form 8-K, White River reported to the SEC and the general public that a "third party ('CP')" had "sold the Company $500,000,000 of United States federal income tax credits issued to a Native American tribe" in exchange for 10,000,000 restricted shares and a profit participation, and that CP would transfer "at least $7 billion" more if White River could "monetize" part of the credits within 90 days.

35. The counterparty was Logistical Concepts, LLC ("Logicepts"), a Texas limited liability company controlled by Henry Wilson Jr. of Houston, Texas. Logicepts claimed that, due to the heritage of Chief Henry Wilson, it functions as a sovereign Native American entity with authority to issue sovereign tribal tax credits. Logicepts' only federal registration was a Commercial and Government Entity ("CAGE") / System for Award Management vendor registration as a "Non-Manufacturer" government contractor.

36. The purported issuance of the credits rested on a Department of Treasury Procurement #: USL88082733220245609. The only support offered for that number was a screenshot from a Treasury Submission Portal listing a pending submission with a value of "5.5 Billion" and a recipient of "White River Energy Co." A pending submission in a federal procurement portal is not, and cannot be, the issuance of a credit against federal income tax.

37. The claimed volume of purported credits was staggering. White River claimed $500 million in November 2023; was promised at least $7 billion more; announced on February 16,

2024 a letter of intent to acquire $13 billion of additional credits for $3 million in cash and 10 million shares; and reported $5,445,200,000 in tax credits as an asset on an amended corporate return. At the time, White River reported total balance-sheet liabilities of approximately $10 million.

38. Purchasers acquired the credits under White River's standard-form "Tax Credit Purchase Agreement" (the "Purchase Agreement"). The Purchase Agreement:

(a) described the credits as Cherokee Nation United States federal trust fund tax credits and priced them at $50,000 per $100,000 "Unit";

(b) contained no representation that the credits were valid or allowable for federal income tax purposes;

(c) represented that White River had no liability or obligation to pay fees or commissions to any broker, finder, or agent;

(d) required the buyer to acknowledge that it had made its own analysis independently and without reliance upon the Seller and had been afforded an opportunity to consult with its legal, accounting and tax professionals (§;

(e) limited White River's tax indemnity to losses arising only after the IRS makes a final binding determination, and the United States Tax Court confirms such determination ... and the times to appeal have expired," and excluded losses caused by the buyer's consultants;

(f) capped White River's total indemnity exposure at $25,000,000; and

(g) gave White River control over any IRS audit and required the buyer to notify White River within two business days of discovering an audit.

### D. E3 Became White River's Paid Distributor and Sold the Credits to Its Own Tax Clients

39. Within weeks of the November 22, 2023 joint venture, and before any law firm had issued a tax opinion on the credits, E3 began soliciting its clients to buy them.

40. In or about December 2023, Mr. Moriarty sent an email to many E3 clients, flagged as "high" importance. The email stated that E3 had sourced tax credits for "select clients" who E3 had determined "could substantially benefit from a federal income tax credit"; that E3 was "very excited about this opportunity to provide you a tremendous return on investment (ROI)"; that clients "will need to take action in the next two weeks"; and that "White River is planning to indemnify all investors that if any tax credits are not accepted by the IRS that White River will repay the initial investment capital to tax payer." The email told clients E3 was conducting due diligence on the offering. (*See* Moriarty Email, dated December 2023, attached as **Exhibit C**).

41. On January 26, 2024, White River Private Capital Management "approved e3 Tax as a distribution partner to offer NATC to the public." White River asked E3 "to build out a network of distribution partners," and E3 obtained an NDA and a "marketing agreement" from White River "to establish a distribution network." E3 prepared and distributed a standardized memorandum on E3 letterhead titled "Native American Tribe Trust Fund Federal Income Tax Credits (NATC)" (the "NATC Memo"). E3 included the NATC Memo in the DocuSign envelopes purchasers executed to buy the credits; upon information and belief, every Class member received the same document.

42. In the NATC Memo, E3 told clients that:

a. White River had entered into a joint venture "with a particular Native American Tribe, The Cherokee Nation," and that the credits had been "issued to the Cherokee Nation by the US Treasury";

b. "White River is indemnifying all investors just in case any tax credits are not accepted by the IRS," and "White River will repay the initial investment capital to the taxpayer";

c. White River had hired a Washington, D.C. law firm to perform due diligence and issue a tax opinion, with an "expected completion date" of "early March 2024"; planned to seek a private letter ruling with "unknown" timing; and was "working to create a warranty mechanism";

d. "[t]hese are income tax CREDITS, not income tax DEDUCTIONS," that "[a] CREDIT saves you all $100,000," and that purchasers would earn returns of 43% to 67%;

e. "most Federal income tax credit programs are priced in the $0.80 to $0.90 range," but NATC was priced at $0.60 "[b]ecause NATC is fairly new to the marketplace," and there was a "lack of awareness in the marketplace regarding this specific type of Native American tax credits"; and

f. purchasers should report the credit on Form 1040, Schedule 3, Part II, line 13z, "Other Payments or Refundable Credits," as "Native American Tax Credits via EIN 88-0827332," attaching White River's certificate.

43. Statement (a) was inaccurate. White River's counterparty was Logicepts, a Texas limited liability company; the White River Forms 8-K that E3 itself cited and hyperlinked in the NATC Memo never mention the Cherokee Nation, describing the counterparty only as "a third party" and the source of the credits only as "a Native American tribe"; and the Cherokee Nation's Attorney General has since sent White River a cease-and-desist letter stating that the Nation "did not authorize and is not associated with these tax credits."

44. Statement (b) materially misdescribed the Purchase Agreement. White River had not promised to "repay the initial investment capital" if the IRS did not accept the credits. Its indemnity was conditioned on a final IRS determination confirmed by the Tax Court after all appeals expired, excluded losses caused by the buyer's "consultants," and was capped at $25 million for all buyers combined, against billions of dollars in claimed credits.

45. Statements (c) and (e) disclosed, in effect, that no tax opinion, private letter ruling or warranty existed when E3 was selling the credits, and that the market priced the credits at a steep discount because they were untested. E3 nonetheless recommended the credits as a tax-mitigation strategy for its clients.

46. E3 also prepared and circulated a slide presentation, under the "e3 familyOFFICE" name, titled "Native American Tax Credits (NATC)" (the "NATC Presentation"). The NATC Presentation announced that "e3 familyOFFICE has partnered with White River Private Capital Management to educate and facilitate the purchase process of NATC for the retail public," and directed readers who were "ready to purchase" to their "Network Partner" or to E3's "NATC Operations Team" at natcteam@e3familyoffice.com. It told prospective purchasers that:

a. the credits are a "unique incentive created by tax treaties between the US Government and Native American Tribes";

b. White River "formed a JV partnership with the Cherokee Nation" and "currently has billions of NATC registered in their name with the US Treasury";

c. the credits are "not tied to any economic project or Congressional bill, so there are no restrictions on who can use the credits";

d. the credits are "100% Refundable," and purchasers could use them "to receive a refund of your Federal Income Tax Withholdings" or "instead of making Federal Estimated Income Tax Payments"; and

e. E3 "expect[s] the price for NATC to potentially increase in the near future."

47. These statements were inaccurate and no reasonably competent tax professional would have made them. No treaty between the United States and any tribe creates a federal income tax credit that may be sold to, or claimed by, unrelated taxpayers. The Cherokee Nation was not White River's counterparty. White River had no credits "registered" with Treasury; it only had a pending submission in a procurement portal. And the White River Tax Credits had no basis in law because a federal income tax credit exists only if Congress enacts it.

48. E3 required each purchaser to sign an E3 Tax "Addendum to the Purchase Agreement of Native American Federal Income Tax Credits" (the "Addendum"). The Addendum recites that the credits "are offered to you per the NDA and marketing agreement that e3 Tax, LLC (dba e3 Family Office) has obtained from White River Energy Corporation to establish a distribution network"; sets the price at "$60,000 per unit for $100,000 of tax credits"; states that "[o]ur fees for services are included in this current price offering and reflect the complexity of this income tax mitigation strategy that has been reviewed on your behalf"; and commits E3, "as a distribution network," to "assist in the follow-up communication with your tax professional as they prepare your annual income tax forms."

49. E3 thus acted at once as the purchaser's paid tax advisor and due-diligence reviewer; the seller's paid distributor; and, for clients whose returns E3 prepared, the return preparer that claimed the credit. Upon information and belief, E3 did not disclose the nature or

extent of this conflict, did not disclose the amount of its per-unit compensation, and did not obtain its clients' informed written consent to the conflict.

50. In reliance on E3's recommendation and advice, Ms. Bunel purchased White River Tax Credits for $150,000 on or about December 26, 2023, representing three units and $300,000 in face amount of credits, for use against her 2023 federal income tax liability. E3 charged Ms. Bunel a separate $10,000 fee, described as a "due diligence" fee, in connection with the purchase. (*See* Daniel Bunel Tax Credit Purchase Agreement, attached as **Exhibit D**). Ms. Bunel signed the Tax Credit Purchase Agreement contemporaneous with E3 circulating the Engagement Agreement. After the documents were fully executed and the White River Tax Credit investment was funded, E3 Tax prepared and filed Ms. Bunel's 2023 federal income tax return claiming the White River Tax Credits in the manner instructed in the NATC Memo.

## E. E3's Tax Advice Fell Far Below the Standard of Care

51. A tax professional who advises a client to take a position on a federal return, or who prepares a return taking that position, must have a sound basis in law for it. The professional standards governing E3's conduct include Internal Revenue Code ("IRC") § 6694, which penalizes return preparers for positions lacking substantial authority (or, if disclosed, a reasonable basis); Treasury Department Circular 230, 31 C.F.R. §§ 10.22 (diligence as to accuracy), 10.29 (conflicts of interest), 10.34 (standards for returns and advice) and 10.37 (requirements for written advice, including that the practitioner not rely on unreasonable factual or legal assumptions or on the representations of others); and the AICPA Statements on Standards for Tax Services. These standards reflect the degree of skill and care ordinarily exercised by tax professionals in E3's position.

52. No provision of the IRC creates a Native American Tribe Trust Fund Federal Income Tax Credit, a Sovereign Tribal Tax Credit, or any credit that a tribe, a tribal nominee, or a private company may sell to an unrelated taxpayer. The IRS does not issue income tax credits to tribes or to anyone else through a Treasury procurement portal. The IRS has now said so expressly. In News Release IR-2026-112 (Sept. 18, 2026), the IRS warned the public about "promoters selling fake 'Tribal Tax Credits' that do not exist under federal law," whether marketed as "Tribal Tax Credits," "Native American Tax Credits," "Sovereign Tribal Tax Credits" or "similar names." The IRS's August 8, 2025 Internal Revenue Manual procedural update, IRM 3.12.15.2.16, "Tribal Tax Credit Scheme", likewise directs IRS personnel that credits so labeled "are highly questionable and cannot be allowed, regardless of documentation provided," and that these "non-valid credits ... should be disallowed." The authorities White River invoked, and that E3 repeated, do not create a transferable credit against a non-tribal taxpayer's federal income tax.

53. A reasonably competent tax professional would have known that the White River Tax Credits lacked any reasonable basis, let alone substantial authority. E3's recommendation that clients purchase the credits as an income tax mitigation strategy, and its instruction that clients claim them on their Form 1040, constituted improper tax advice.

54. E3's instruction compounded the harm. Reporting the credits as payments or refundable credits caused clients to understate their balance due, or to claim refunds, on the basis of payments that did not exist. E3's NATC Presentation magnified that exposure by urging purchasers to use the credits to obtain tax refunds. That exposed clients to the full tax deficiency, failure-to-pay and estimated-tax penalties, interest, accuracy-related penalties under IRC § 6662, and the 20% penalty for erroneous refund claims under IRC § 6676.

55. E3's own documents confirm that it lacked a legal foundation for its advice. On October 31, 2025, after the credits were disallowed, E3 Tax wrote to the IRS on behalf of a Class member that "[l]aws surrounding the sovereignty and authority of Tribes are obscure and complex, particularly when it comes to tax matters," and argued that the credits should be honored because there were no court decisions or "authoritative IRS rulings indicating that the Tribal Tax Credits ... are invalid." That argument inverts the governing standard. A taxpayer claiming a credit must identify authority for it; the absence of a ruling against a credit that no statute creates is not authority. E3's letter also urged the IRS to honor the credits because they "have been approved for other clients' tax returns."

## F. E3 Did Not Perform the Due Diligence It Promised and Was Paid to Perform

59. E3 repeatedly promised, and charged for, due diligence. The Engagement Agreement included "Advance Due Diligence Resources" and "due diligence on proprietary wealth & tax strategies offered by the e3 network." E3's December 2023 email told clients it was conducting due diligence on the offering. (*See* **Ex. C**). E3 charged Ms. Bunel, and upon information and belief other Class members, a separate "due diligence" fee.

60. Reasonable diligence by a tax professional would have identified, at a minimum, the following red flags, each of which was apparent from documents in E3's possession (many of which E3 itself later submitted to the IRS):

a. **No statutory basis.** No IRC provision authorized the credits, and none of the authorities cited by White River created a transferable credit. E3's own NATC Presentation conceded that the credits were "not tied to any ... Congressional bill."

b. **The issuer was not a tribe.** The counterparty was a Texas limited liability company with a government-contractor vendor registration and an undisclosed owner, claiming sovereign authority based on its principal's personal "heritage."

c. **Inconsistent tribal identity.** The credits were attributed variously to "The Cherokee Nation" (E3's NATC Memo and the Purchase Agreement), a "confidential Native American tribe" (the joint venture letter), "the Cherokee or Chuckwa Tribes" (Logicepts) and the "Freedmen Tribe" (E3's October 2025 letter to the IRS). No tribal resolution, tribal authorization or tribal counterparty was ever produced.

d. **No issuance by the IRS.** The only evidence of "issuance" was a pending submission in a Treasury procurement portal.

e. **Implausible scale.** A thinly capitalized over-the-counter oil company claimed billions of dollars in federal tax credits, acquired for stock and nominal cash.

f. **No opinion, ruling or warranty.** No tax opinion, private letter ruling or warranty existed when E3 sold the credits, and the joint venture left any legal opinion to White River's "sole discretion."

g. **Deep discount.** E3 itself acknowledged that legitimate credits trade at $0.80 to $0.90 on the dollar, while these were offered at $0.50 to $0.60.

h. **Seller disclaimers.** White River disclaimed any assurance of IRS acceptance, required buyers to disclaim reliance, conditioned its indemnity on a final Tax Court judgment, capped it at $25 million, and reserved control over audits.

i. **Use of proceeds.** White River's Form 8-K stated that the proceeds would be used first to pay White River's own liabilities and then to buy oil production and fund drilling, not to fund tribal programs.

j. **Pressure to monetize.** Additional credits and the vesting of the counterparty's shares were tied to how quickly White River could convert the credits to cash, "after broker-fees."

k. **Undisclosed distribution compensation.** White River represented that it owed no broker or agent fees, while E3 embedded its own compensation in the price it charged clients.

61. E3's own written work product confirms that it performed no meaningful due diligence. Upon information and belief, the NATC Memo is the only written summary of E3's due diligence that E3 provided to purchasers, and E3 placed it in the DocuSign envelope each purchaser executed to buy the credits. The NATC Memo is five pages long and consists entirely of a restatement of White River's own Form 8-K disclosures, website links, a list of protections White River said it was offering or hoped to obtain, every one of which was conditional, pending or prospective and broad, varying investment returns of 43% to 67%.

62. The NATC Memo contains no citation to any provision of the Internal Revenue Code authorizing the credits and no legal or tax analysis of any kind. It does not discuss the risk that the IRS would disallow the credits or the tax, penalties and interest that would follow. It does not analyze the conditions on White River's indemnity, its $25 million cap or White River's ability to pay it. It does not identify the entity that actually conveyed the credits to White River, and it reports no verification with the Cherokee Nation, Treasury, the IRS or the Bureau of Indian Affairs. It does not disclose E3's compensation as White River's distributor.

63. Upon information and belief, E3 did not obtain an independent tax opinion; did not wait for the promised Washington, D.C. tax opinion or private letter ruling; did not verify the credits' existence with the IRS, Treasury, the Bureau of Indian Affairs or the Cherokee Nation; did not analyze or explain the conditions and cap on White River's indemnity; and did not disclose the red flags described above. Instead, E3 relied on, and repackaged, the promotional materials supplied by White River and Logicepts.

64. Had E3 exercised ordinary professional care, it would have concluded that the White River Tax Credits had no basis in law and would not be allowed, and it would have advised its clients not to buy them and not to claim them. The IRS's September 2026 warning confirms that the features of this offering are recognized warning signs of an abusive scheme: "[o]ffers to purchase tax credits for substantially less than their value"; claims "that taxpayers must act quickly"; "[r]eferences to government or interagency agreements that are not publicly available"; "[l]egal opinions that cannot be verified directly with the attorney or law firm identified"; and "[r]equests to sign a nondisclosure agreement." Every one of these red flags was present here.

## G. E3 Failed to Correct Its Advice as the Warnings Mounted

65. In March 2025, the IRS informed the Senate Finance Committee: "We can confirm that these tax credits do not exist," and warned that "[t]axpayers who claim credits that don't exist are subject to penalties and possible examination." On April 14, 2025, Senators Ron Wyden and Catherine Cortez Masto wrote to the Acting IRS Commissioner **identifying "E3 Family Office" among the promoters of the credits and requesting a criminal investigation**. Beginning in June 2025, the IRS revised the Internal Revenue Manual to address what it labeled the "Tribal Tax Credit Scheme." Its August 8, 2025 procedural update lists "Tribal Tax Credit," "Native American Tax Credit," "Sovereign Tribal Tax Credit" and "Section 6418" as credits that "are highly

questionable and cannot be allowed, regardless of documentation provided," and directs that these "non-valid credits ... should be disallowed." On August 19, 2025, Senator Wyden disclosed that the Department of Justice Tax Division is investigating promoters of the credits. On September 18, 2026, the IRS issued a nationwide warning that the credits "do not exist under federal law" and that taxpayers who claim them "may face civil and criminal penalties."

66. E3 did not advise its clients to correct their returns or mitigate their exposure. Instead, as late as October 31, 2025, E3 Tax continued to press the credits' validity before the IRS on behalf of Class members. The IRS has described exactly this conduct as a promoter tactic: "Promoters may also urge taxpayers who previously claimed these fake credits to challenge the IRS during an audit. A federal tax return claiming a nonexistent Tribal Tax Credit contains a false claim, regardless of whether a refund was issued initially based on the fake Tribal Tax Credit."

67. When Ms. Bunel raised concerns about the credits, E3 told her that it had retained the Akerman law firm to assist affected clients. Akerman later withdrew without accomplishing anything for her, and E3 thereafter stopped communicating with her about the credits.

**H. E3's Compensation from the Sale of the White River Tax Credits**

68. E3 profited from the sale of the White River Tax Credits in at least four ways.

69. **Per-unit spread.** White River's Purchase Agreement set the price at $50,000 per $100,000 unit. E3's Addendum charged its clients $60,000 per unit and stated that E3's "fees for services are included in this current price offering." E3 thus retained $10,000 per unit: one-sixth of every dollar its clients paid, and a 20% markup over White River's price.

70. **"Due diligence" fees.** E3 charged Ms. Bunel a separate $10,000 "due diligence" fee and, upon information and belief, charged similar fees to other Class members.

71. **Engagement fees.** E3 charged engagement clients annual flat fees, $30,000 at the WTPS.12 tier, that expressly included due diligence on the strategies E3 offered.

72. **Post-disallowance fees.** The Engagement Agreement provides that E3 will represent clients in an IRS examination "at our standard hourly rates." Upon information and belief, E3 charged Class members additional fees to respond to the IRS notices that its own advice caused.

73. In a letter dated May 15, 2026, White River's outside general counsel stated that "e3 Family collected commissions and a tax planning fee from you and other third parties that amount to between $5,000,000 and $10,000,000," and that "[t]his figure could be higher when adding in the commission and tax planning fee." The same letter states that White River reserves claims against E3 concerning "e3 Tax's purchaser-facing distribution-network, diligence, and tax-support activities."

74. Upon information and belief, if E3's compensation of $5 million to $10 million was derived from a $10,000 per-unit spread, Class members purchased approximately 500 to 1,000 units through E3, paying approximately $30 million to $60 million for credits with a claimed face value of approximately $50 million to $100 million.

## I. The IRS Has Disallowed the Credits, and Class Members Have Been Damaged

75. The IRS has disallowed the White River Tax Credits on Class members' returns. Its notices state: "We didn't allow the amount claimed as other credits on your tax return because it is not an allowable credit." These disallowances implement the IRS's internal directive that such "non-valid credits ... should be disallowed."

76. With respect to Ms. Bunel, the IRS issued a notice, disallowing the White River Tax Credits claimed on her 2023 return, assessing penalties and interest. Ms. Bunel has lost the

$150,000 she paid for the credits and the $10,000 "due diligence" fee, and she has incurred additional tax, penalties, interest and professional fees.

77. As a direct and proximate result of E3's conduct, Plaintiff and the Class have suffered damages including: (a) the purchase price of the credits; (b) all fees and compensation paid to E3 in connection with the credits, including the per-unit spread, "due diligence" fees and the portion of engagement fees attributable to E3's tax-mitigation and due-diligence services; (c) penalties assessed by the IRS and state taxing authorities; (d) interest on resulting deficiencies; (e) the professional fees and costs of responding to the IRS and correcting returns; and (f) the loss of the use of these funds.

## CLASS ACTION ALLEGATIONS

78. Plaintiff brings this lawsuit as a class action on behalf of herself and all others similarly situated as members of the proposed Class described as follows:

**Nationwide Class**

79. All persons and entities who, from November 22, 2023 through the present, purchased White River Tax Credits through, or on the recommendation of, any Defendant, and paid fees to E3 pursuant to an Engagement Agreement and/or paid a due diligence fee.

80. Excluded from the Class are Plaintiff's counsel and family members, Defendants' employees, officers, directors; Defendants' legal representatives, successors, and assigns; any entity in which Defendants have a controlling interest; any Judge to whom the litigation is assigned and all of members of the Judge's immediate family; and all persons who timely and validly request exclusion from the Class.

81. This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, because it meets all the requirements of Rule 23(a)(1-4), including the

numerosity, commonality, typicality and adequacy requirements, and it satisfies the requirements of Rule 23(b)(3) in that the predominance and superiority requirements are met.

82. Numerosity. The Class is so numerous that joinder of all members is impracticable. E3 distributed the White River Tax Credits through a standardized email campaign to "many" of its clients, a standardized NATC Memo, a standardized Addendum and a NATC Presentation directed to "the retail public," and it built a network of sub-distributors at White River's request. White River's counsel has stated that E3 collected $5 million to $10 million in compensation from purchasers. Upon information and belief, the Class includes hundreds of members located throughout the United States. The identity of each Class member, and the amount each paid, can be determined from Defendants' records, including executed Addenda, Purchase Agreements, wire records and engagement files.

83. Commonality. There are numerous questions of fact or law that are common to Class Plaintiff and all the members of the Classes. Common issues of fact and law predominate over any issues unique to individual class members. Issues that are common to all class members include, but are not limited to the following:

a. whether Missouri law applies to all class members;

b. whether Defendants breached their contract with Class members;

c. whether the White River Tax Credits had any basis in the Internal Revenue Code or other federal law;

d. whether a Defendants failed to provide competent tax advise related to the sale of the White River Tax Credits;

e. whether E3's NATC Memo, NATC Presentation, December 2023 solicitation, Addendum and filing instructions constituted tax advice that fell below the applicable standard of care;

f. whether E3 adequately fulfilled its contractual and legal duty to conduct the due diligence it promised and was paid to perform, and what a reasonable due-diligence review would have revealed;

g. whether E3 breached its contractual and legal duty of care to Class Members in recommending and evaluating the credits; and/or receiving undisclosed compensation from White River;

h. whether Defendants breached their contract with Class members; and

i. the proper measure of damages, including the return of E3's per-unit spread and fees. These common questions predominate over any individual questions. E3's conduct was uniform: it sold the same nonexistent credits, through the same documents, with the same filing instructions, under the same form contracts. The validity of the credits is a single question with a single answer for every Class member. None of Plaintiff's claims requires proof of individual reliance, and the elements of duty, breach and causation will be established through common evidence. Individual damages can be calculated from Defendants' transaction records and Class members' IRS notices using a common formula.

84. Typicality. Plaintiff's claims are typical of the claims of the Class. Plaintiff, like every Class member, purchased White River Tax Credits through E3 on the strength of E3's uniform tax advice and due-diligence representations, paid E3's embedded compensation, and

suffered damages when the IRS disallowed the credits. Plaintiff is also a member of the Engagement Subclass and, upon information and belief, the Return Preparation Subclass.

85. Adequacy of Representation. Plaintiff will fairly and adequately represent the interests of the members of the Classes. Plaintiff does not have claims that are unique to her and not the other class members within their respective Classes, nor are there defenses unique to Plaintiff that could undermine the efficient resolution of the claims of the Classes. Further, Plaintiff is committed to the vigorous prosecution of this action and have retained competent counsel, experienced in class action litigation, to represent them. There is no hostility between Plaintiff and the unnamed class members. Plaintiff anticipates no difficulty in the management of this litigation as a class action.

86. Predominance. Common questions of law and fact predominate over questions affecting only individual class members. The only individual issues likely to arise will be the amount of damages recovered by each class member, the calculation of which does not bar certification.

87. Superiority. A class action is superior to all other feasible alternatives for the resolution of this matter. Individual litigation of multiple cases would be highly inefficient and would waste the resources of the courts and of the parties. The damages sought by Plaintiff and class members are relatively small and unlikely to warrant individual lawsuits given the fees and costs, including expert costs, required to prosecute claims for those fees and premiums.

88. Manageability. This case is well suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a class wide basis, while the allocation and distribution of damages to class members would be essentially a ministerial function.

89. Ascertainability. Class members are readily ascertainable. Some or all of Defendants keep detailed electronic records that show, among other information, the false advertisements, the names of those who responded to the false advertisements and the names and transaction histories of class members whose plan or AOR status was changed by one or more Defendants.

**Rule 23(c)(4): Issue Certification**

90. Alternatively, Plaintiff seeks certification of particular issues under Rule 23(c)(4), including the questions identified herein.

## COUNT I — PROFESSIONAL NEGLIGENCE

*(Against All Defendants, on Behalf of Plaintiff and the Class)*

91. Plaintiff incorporates Paragraphs 1 through 90 as if fully set forth herein.

92. Defendants held themselves out as tax professionals and provided tax preparation, tax planning and tax-mitigation advice to Plaintiff and the Class for compensation. E3 Tax employs certified public accountants and prepares and files federal income tax returns. With respect to every Class member, E3 undertook to evaluate the White River Tax Credits as an "income tax mitigation strategy" "reviewed on your behalf," to advise on how the credits should be reported, and to assist with the preparation of Class members' returns.

93. By reason of that professional relationship, Defendants owed Plaintiff and the Class a duty to exercise the degree of skill, care and learning ordinarily exercised by reasonably competent tax professionals under the same or similar circumstances, including duties to:

a. recommend, and advise clients to claim, only tax positions supported by substantial authority or, at a minimum, a reasonable basis in law;

b. conduct a reasonable, independent investigation of any tax strategy before recommending it, rather than relying on the promoter's materials;

c. accurately describe the tax risks of a strategy, including the risk of disallowance, the resulting tax, penalties and interest, and the terms and limitations of any indemnity;

d. refrain from preparing or instructing clients to file returns claiming credits that lack a reasonable basis;

e. identify, disclose and manage conflicts of interest, including compensation received from the promoter of a recommended strategy; and

f. monitor developments bearing on a recommended strategy and advise clients promptly of corrective action.

95. Defendants breached these duties by, among other things:

a. recommending the White River Tax Credits as an income tax mitigation strategy when no statute authorized them and they lacked any reasonable basis in law;

b. failing to recognize, investigate or disclose the red flags;

c. relying on, and repackaging, the promotional materials of White River and Logicepts instead of conducting an independent review;

d. misdescribing the issuer of the credits as "The Cherokee Nation";

e. misdescribing White River's indemnity as a promise to "repay the initial investment capital" if the IRS did not accept the credits;

f. recommending and selling the credits before any tax opinion, private letter ruling or warranty existed;

g. instructing Class members to report the credits as "Other Payments or Refundable Credits" on Schedule 3, line 13z, and, for the Return Preparation Subclass, preparing and filing returns claiming the credits;

h. failing to disclose and manage E3's conflict of interest as White River's compensated distributor; and

i. failing to advise Class members to correct their returns or otherwise mitigate their exposure once Treasury and the IRS had publicly confirmed that the credits do not exist, and instead continuing to advance the credits before the IRS.

96. But for Defendants' breaches, Plaintiff and the Class would not have purchased the White River Tax Credits, would not have paid E3's associated fees and compensation, and would not have claimed the credits on their returns. The IRS's disallowance of the credits and the resulting tax, penalties and interest were the natural, probable and foreseeable consequences of Defendants' breaches.

97. As a direct and proximate result of Defendants' professional negligence, Plaintiff and the Class have suffered the damages described herein, in amounts to be proven at trial.

98. Each Defendant participated in, directed or is otherwise responsible as principal, agent or joint venturer for the conduct alleged in this Count, and Defendants are jointly and severally liable.

## COUNT II — NEGLIGENCE

*(Against All Defendants, on Behalf of Plaintiff and the Class)*

99. Plaintiff incorporates Paragraphs 1 through 98 as if fully set forth herein.

100. This Count is pleaded in the alternative to Count I, to the extent any Defendant is found not to have been in a professional relationship with Plaintiff or any Class member.

101. Independent of any contract, Defendants voluntarily undertook to evaluate the White River Tax Credits, to perform due diligence on them, to recommend them to identified clients as a tax-mitigation strategy, to describe their tax treatment and the protections available to purchasers, and to instruct purchasers how to claim them. Having undertaken those tasks, Defendants owed Plaintiff and the Class a duty to perform them with reasonable care.

102. Plaintiff and Class members were known and identified recipients of Defendants' recommendations and advice. Defendants intended that they rely on that advice, solicited their purchases, were compensated on every unit sold, and knew that negligent advice would cause them to lose their purchase price and incur tax, penalties and interest. The harm to Plaintiff and the Class was therefore foreseeable.

103. Defendants stood in a special relationship of trust and superior knowledge with Plaintiff and the Class, who lacked the training to evaluate the credits and relied on Defendants to do so. Defendants' duty of care arises from that relationship and from Defendants' undertaking, independent of the terms of any contract.

104. Defendants breached their duty of care through the acts and omissions described herein.

105. As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered the damages described herein, in amounts to be proven at trial.

## COUNT III — BREACH OF CONTRACT

*(Against E3 Consultants Group, LLC, E3 Tax d/b/a E3 Family Office)*

106. Plaintiff incorporates Paragraphs 1 through 105 as if fully set forth herein.

107. Plaintiff and the members of the Engagement Subclass entered into Engagement Agreements with E3 Consultants and E3 Tax. Plaintiff and every Class member entered into an

Addendum with E3 Tax. The Engagement Agreements and Addenda are valid and enforceable contracts, drafted by E3 on standard forms and supported by consideration, including the engagement fees, "due diligence" fees and the E3 "fees for services" embedded in the per-unit price.

108. Plaintiff and the Class performed their obligations under these contracts, including by paying all fees and the full purchase price charged by E3.

109. Under the Engagement Agreements, E3 Consultants and E3 Tax expressly agreed, among other things, to provide "Advance Due Diligence Resources" and "due diligence on proprietary wealth & tax strategies offered by the e3 network"; to provide "Income Tax Preparation" that would "ensure compliance with the IRS tax code ... through accurate and complete tax filing"; to "advise you on the tax implications of an investment in light of today's tax laws"; to "use our professional judgment in evaluating and advising you" of the tax ramifications of clients' investments; to pursue the "goal" of reducing "the chance of an IRS audit"; to "use our best efforts for you at all times"; and, where an adverse result is caused by E3's negligence, to "pay the penalty."

110. Under the Addendum, E3 Tax expressly agreed that its "fees for services" were consideration for a tax strategy "that has been reviewed on your behalf," and agreed to "assist in the follow-up communication with your tax professional as they prepare your annual income tax forms."

111. Every contract governed by Missouri law contains an implied covenant of good faith and fair dealing, and a contract for professional services carries an implied obligation to perform those services with the skill and care ordinarily exercised by members of the profession. E3 held discretion over which strategies to present to its clients, how to evaluate them and how to

price them. E3 exercised that discretion to advance its own interest as White River's compensated distributor, depriving Plaintiff and the Class of the objective tax advice and due diligence for which they bargained.

112. E3 Consultants and E3 Tax breached the Engagement Agreements and the Addenda by, among other things.

a. Failing to perform the due diligence they promised and for which they charged;

b. presenting, as a reviewed tax-mitigation strategy, credits that had no basis in law;

c. advising Class members to claim, and for the Return Preparation Subclass claiming, credits that rendered their returns inaccurate and noncompliant with the Internal Revenue Code;

d. failing to exercise professional judgment in advising Class members of the tax ramifications of the credits;

e. increasing, rather than reducing, Class members' audit and penalty exposure;

f. failing to perform their services with the skill and care ordinarily exercised by tax professionals;

g. breaching the implied covenant of good faith and fair dealing as described above; and

h. failing to pay the penalties assessed against Class members as a result of E3's negligence.

113. As a direct and proximate result of these breaches, Plaintiff and the Class have suffered damages, including the return of all engagement fees, "due diligence" fees and embedded E3 compensation paid for services E3 did not perform; the penalties E3 agreed to pay; and the purchase price, tax, interest and professional fees that were the natural and foreseeable

consequence of E3's breaches, in amounts to be proven at trial. Plaintiff and the Class are ALSO entitled to prejudgment interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court enter judgment in her favor and against Defendants, jointly and severally, and:

(a) certify this action as a class action under Rule 23(a) and (b)(3), or alternatively Rule 23(c)(4); certify the Class and subclasses defined above; appoint Plaintiff as Class Representative; and appoint her counsel as Class Counsel;

(b) award Plaintiff and the Class compensatory damages, including the purchase price of the White River Tax Credits, all fees and compensation paid to Defendants in connection with the credits, and all resulting tax, penalties, interest and professional fees, in an amount to be determined at trial;

(c) award prejudgment interest, including under Mo. Rev. Stat. § 408.020, and post-judgment interest under 28 U.S.C. § 1961;

(d) award Plaintiff and the Class their costs of suit; and

(e) grant such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

Dated: November 11, 2026

Respectfully submitted,

**WOLPER LAW FIRM, P.A.**
1250 S. Pine Island Road, Suite 355
Plantation, FL 33324
Local: 954.406.1231
Toll-Free: 800.931.8452
Direct: 754.551.7388
mwolper@wolperlawfirm.com

By: /s/Matt Wolper________
Matt Wolper, Esq.
*Counsel for Plaintiff and the Proposed Class*
[*Pro hac vice* application forthcoming]

**THE DOSS LAW FIRM, LLC**
1827 Powers Ferry Road SE
Building 23, Suite 100
Atlanta, Georgia 30339
(770) 578-1314 (Telephone)
(770) 578-1302 (Facsimile)
jasondoss@dossfirm.com

By: /s/ Jason R. Doss_______
Jason R. Doss
*Counsel for Plaintiff and the Proposed Class*
[*Pro hac vice* application forthcoming]

**COSGROVE SIMPSON, LLC**

/s/Charles Max Simpson___________
Charles Max Simpson, #66228 MO
David B. Cosgrove, #40980 MO
7800 Forsyth Blvd., Suite 610
St. Louis, MO 63105
Telephone: (314) 563-2490
Fax: (314) 968-7371
msimpson@cosgrovesimpsonlaw.com
dcosgrove@cosgrovesimpsonlaw.com
*Counsel for Plaintiff and the Proposed Class*